UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RE-SOURCE AMERICA, INC.,

                      Plaintiff,

          -v-

CORNING INCORPORATED,

                      Defendants.

DECISION AND ORDER

07-CV-6048 CJS

_____

APPEARANCES

For Plaintiff:                Stephen P. Pazan, Esq.
                               Spector Gadon & Rosen, P.C.
                               1000 Lenola Road, P.O. Box 1001
                               Moorestown, New Jersey 08057

For Defendant:            Richard A. McGuirk, Esq.
                               Terence L. Robinson, Jr., Esq. VC
                               Nixon Peabody LLP
                               1100 Clinton Square
                               Rochester, New York 14604-1792

INTRODUCTION

      This action arises from a business relationship between defendant Corning, Inc. ("Defendant"), a manufacturer of optical fiber and cable, and plaintiff Re-source America, Inc. ("Plaintiff"), a company which refurbished packaging materials. Now before the Court are the following motions: 1) Plaintiff's motion to file a Fourth Amended Complaint (Docket No. [#64]); 2) Plaintiff's motion for partial summary judgment (Docket No. [#82]); and Defendant's motion for partial summary judgment (Docket No. [#86]). For the reasons that follow,

Plaintiff's applications are denied, and Defendant's application is granted in part and denied in part.

BACKGROUND

The parties' business relationship existed during the period 1993 through May 31, 2006. At all relevant times, Defendant manufactured optical fiber cable, which was packaged on plastic spools that could be refurbished and reused. In or about 1993, Plaintiff developed a patented system for refurbishing such spools and other packaging materials. Subsequently, the parties entered into a business arrangement, in which Plaintiff recovered used packaging materials from Defendant's customers, refurbished the materials, and sold them back to Defendant.

The plastic spools were covered with foam padding to protect the cable. As part of the refurbishment process, Plaintiff inspected each spool, and repaired, or "re-foamed," the spools with damaged foam. However, Plaintiff's "re-foaming" process was not always effective, and sometimes caused problems with Defendant's manufacturing process. Eventually, Defendant decided not to accept re-foamed spools from Plaintiff. Defendant's decision was problematic for Plaintiff, since the foam was inspected at the end of the refurbishment process, after Plaintiff had already incurred the expense of cleaning the spools. Additionally, Defendant's decision caused Plaintiff to accumulate an inventory of spools with damaged foam, for which it had no use. Consequently, Plaintiff began exploring new "re-foaming" methods, in the hope of finding one that would be acceptable to Defendant.

In 1994 Plaintiff opened a facility in Mebane, North Carolina to provide spool refurbishment services for Defendant's Wilmington, N.C. plant. Subsequently, the parties considered having Plaintiff open similar refurbishing facilities in Wales and Germany to serve

Defendant's newly-acquired manufacturing operations in those locations. In August 2000, the parties executed their only written agreement, covering the period August 2000 through December, 2003. In relevant part, the contract contained a provision dealing with the creation of refurbishing facilities outside of the United States. That provision ("the Base Loading Provision"), contained in "Attachment A" to the contract, entitled "Scope of Work," states, in relevant part:

> Refurbishment plants will be located domestically and internationally as required by Corning and as agreed to with Resource America under rules of engagement and scope of work.
> ***
> Base Loading: A consistent volume of 30M [30,000] spools in Resource America's Mebane, NC facility will be required before considering refurbishment in Europe, South America or Asia. In addition, a volume of 35-40 pallets consistently per week will be required to qualify for a refurbishment facility in Europe, Asia, or South America. Should a refurbishment center be started and volumes drop below required levels for a period of three (3) months, Corning will supplement the cost and make a decision if the facility shutdown should occur.

(Docket No. [#73-3] at p. 13). The agreement contained a New York forum- selection and choice-of-law provision. (Agreement ¶ 14).

During the term of the written agreement, at Defendant's direction Plaintiff opened refurbishing plants in Wales and Germany. However, toward the end of 2001, the worldwide market for Defendant's product declined sharply and unexpectedly. Instead of closing Plaintiff's plants in Wales and Germany at that time, the parties orally agreed that Defendant would advance payments to Plaintiff to cover Plaintiff's operating costs, which Plaintiff would repay[1] once the market for optical fiber rebounded. According to Plaintiff, the parties agreed

---

[1]The parties disagree as to whether such "repayment" was to be in cash or in refurbished spools. It appears from the record that the parties originally envisioned that Plaintiff would repay the advance by providing refurbished spools, but that over time, Defendant became dissatisfied with that arrangement, since,

3

that once the market improved, Plaintiff could repay the debt incrementally by providing refurbished spools, and that Defendant would buy enough of Plaintiff's product so that Plaintiff would be able to pay off the advances and be profitable. This oral agreement is referred to herein as the Prepaid Advance Agreement. Notably, the parties expected that the Prepaid Advance Agreement would last only a few months, since they expected consumer demand to rebound quickly. *See, e.g.*, Plaintiff's Memo of Law [#92] at 8 ( "[T]he pre-paid balance was a classic contract that was originally intended to be repaid in less than a year."); *Id*. at 10 ("[T]he parties originally expected the pre-paid balance to be retired only a few months after its inception.").

In or about October 2001, Defendant began advancing payments to Plaintiff pursuant to the Prepaid Advance Agreement. Nevertheless, in or about December 2001, Plaintiff closed its Welsh plant due to lack of business.[2] The economic downturn lasted longer than either party anticipated, and in or about July 2002, the prepaid advance balance had grown to approximately $1.7 million. In or about August 2002, Plaintiff closed its plant in Germany.[3] By late 2002, Defendant, concerned about the size of the prepaid balance, insisted that Plaintiff begin repaying the advance incrementally. At the same time, Plaintiff sought payments from Defendant relating to the closure of Plaintiff's European plants. Specifically,

---

due to low demand for product, the prepaid balance was essentially not being reduced.

[2]According to Plaintiff, the Wales plant was opened in December 2000, and sold no spools to Defendant until April 2001. Plaintiff further states that although the facility began to meet expenses in August 2001, Defendant directed that the plant be closed the following month, September 2001. (Plaintiff's Rule 56.1 Appendix [#85], Exhibit M).

[3]Plaintiff maintains that when Plaintiff's German plant opened, Defendant did not purchase spools during the first four months of operation. Plaintiff further indicates that because of the type of spools being used in Germany, and because of decisions made by Defendant, Plaintiff's German plant was never successful. (Plaintiff's Rule 56.1 Appendix [#85], Exhibit M).

4

Plaintiff maintained that pursuant to the Base Loading Provision, Defendant owed Plaintiff more than eight hundred thousand dollars in connection with the failed European venture. (Plaintiff's Rule 56.1 Appendix, Exhibit RA 25). Plaintiff proposed that such amount be applied to reduce the prepaid balance. *Id*. However, Defendant declined that offer, and maintained that Defendant's claim to the prepaid balance and Plaintiff's claim to European plant costs were unrelated issues. *Id*. at Exhibit RA 33. Defendant also maintained that it had already satisfied any obligation that it had to supplement Plaintiff's costs associated with the failed European venture. (See, e.g., McGuirk Affirmation [#102], Exhibit 42).[4]

In 2004 consumer demand for Defendant's fiber cable resumed, and Defendant sought a swift return of the remaining prepaid balance. In that regard, Plaintiff maintains, Defendant reneged on its promise to allow Plaintiff to repay the advanced monies gradually. Instead, Plaintiff alleges, Defendant withheld payments on work Plaintiff performed until Plaintiff agreed to an accelerated repayment schedule. Additionally, Defendant unilaterally demanded 13% interest on the advances. Plaintiff contends that it went along with Defendant's demands only because Defendant indicated that the parties' business relationship would continue as before once the advance was repaid. In that regard, Defendant allegedly also indicated that it was willing to re-consider using Plaintiff's re-foamed spools.

However, Defendant's internal documents show that Defendant had already decided not to continue doing business with Plaintiff. *See, e.g.*, Plaintiff's Rule 56.1 Appendix, Exhibit

---

[4]Nevertheless, as late as May 2004, Defendant indicated that it was willing to make an additional contribution toward Plaintiff's losses on the European venture in order to resolve the dispute. *Id*. at Exhibit RA 34.

5

RA 46 ("This is a bad business relationship, [Resource America] has taken advantage of Corning and we've had to fight very hard to get to the place where we are today. Long term [Resource America] should not be considered a viable vendor but I want to recover as much of our money as possible first.").[5] Nevertheless, Plaintiff alleges, in August 2005, Defendant told Plaintiff that Defendant was pleased with Plaintiff's progress on repayment, and that Defendant "looked forward to price concessions from [Plaintiff] for 2006 in anticipation of growing volume." (Amended Complaint ¶ 74).

Plaintiff finished repaying the advance, with interest, in late 2005. Immediately thereafter, on March 15, 2006, during a meeting that allegedly lasted only "two minutes," Defendant notified Plaintiff that it was terminating the parties' business relationship, effective May 31, 2006. (McGuirk Aff. [#86-3], Exhibit 31, Grey Deposition at p. 316). Significantly, at that meeting, Plaintiff hoped to negotiate a new agreement, and had planned to make unspecified "proposals for price reduction." *Id*. In that regard, as mentioned above, Defendant had allegedly indicated, in August 2005, that in 2006 it would expect price concessions from Plaintiff.

On July 28, 2006, Plaintiff commenced the subject action in the United States District Court for the District of New Jersey. On Defendant's motion, the New Jersey court transferred the action to this Court. Upon being assigned the case, the undersigned referred all non-dispositive pretrial matters in the case to the Honorable Jonathan W. Feldman, United States Magistrate Judge. On April 4, 2007, Magistrate Judge Feldman issued a

---

[5]Defendant's dissatisfaction with Plaintiff apparently stemmed from various factors, including: Plaintiff's failure to repay the prepaid advance; Plaintiff's insistence that it was owed money for the European venture; and Plaintiff's refusal to return spools with damaged foam, which Defendant wanted to recycle to make new spools. *Id*. at Exhibits RA 45-46.

6

Scheduling Order [#28], which, *inter alia*, directed that "[a]ll motions . . . to amend the pleadings shall be filed on or before May 1, 2007." Magistrate Judge Feldman's Order further stated that "[n]o extension of the above cutoff dates will be granted except upon written application, made <u>prior to the cutoff date</u>, showing good cause for the extension." (Emphasis in original).

The operative pleading in this action is Plaintiff's Third Amended Complaint. The Third Amended Complaint purports to state three causes of action. The first cause of action, entitled "Breach of Contract," states a claim for breach of the parties' written agreement, and more specifically, the contract's "Base Loading" provision. As to this cause of action, Plaintiff seeks money damages to supplement its costs relative to the operation and closing of the plants in Wales and Germany.

The second cause of action, entitled "Misrepresentation, Bad Faith and Breach of Oral Contract," pleads a claim for breach of the parties' oral Prepaid Advance Agreement. The claim alleges that as part of the oral agreement, the parties agreed that their business relationship would have to continue over the long term in order for Plaintiff to realize any benefit from the arrangement. Plaintiff further alleges that the parties agreed that Plaintiff would "repay" the advance incrementally, once demand for Defendant's product resumed, by providing refurbished spools to Defendant, and by applying a percentage of amounts billed for those spools to the prepaid balance. Furthermore, Plaintiff alleges that it intended to include "re-foamed" spools in its shipments to Defendant, to pay down the balance. Plaintiff contends that Defendant breached the Prepaid Advance Agreement in several respects, by: 1) accelerating Plaintiff's repayment obligation; 2) imposing thirteen-percent interest on the prepaid balance; 3) frustrating Plaintiff's ability to repay the debt by refusing

7

to accept re-foamed spools; and 4) terminating the parties' business relationship before Plaintiff could realize the anticipated benefits of the agreement. With regard to the re-foamed spools, Plaintiff alleges that Defendant acted in bad faith, because, subsequent to the agreement, Defendant determined that it was more cost-effective for Defendant to have the damaged spools ground up and recycled into new spools, thereby lowering Defendant's cost for new spools, rather than paying Plaintiff for re-foamed spools.

In addition to the breach of contract claim, the second cause of action pleads a claim for promissory estoppel. In that regard, Plaintiff alleges that Defendant made false statements, to induce Plaintiff to accelerate repayment of the prepaid balance. Specifically, Plaintiff alleges that Defendant falsely promised that: 1) Defendant would conduct a good-faith review of the re-foaming process; and 2) Defendant would conduct good-faith negotiations for a continued business relationship with Plaintiff once the balance was repaid.[6] For damages, Plaintiff demands the return of the interest charged by Defendant, as well as "recovery for lost profits on recycled spools that could have been refurbished, as well as and [sic] reasonable expectation damages." (Third Amended Complaint ¶ 85).

The third cause of action, entitled "Bad Faith and Intentional Business Torts," also states a claim for promissory estoppel, which is somewhat duplicative of the promissory estoppel claim in the second cause of action. In that regard, the third cause of action alleges that Defendant promised that, in exchange for Plaintiff's accelerated repayment of the prepaid balance, Defendant would engage in good-faith negotiations for future business.

---

[6]As the Court previously explained, "an alleged agreement to negotiate in good faith at a later time, as alleged here by Plaintiff, is not sufficiently definite to be enforced as a contract." (Decision and Order [#59] at 15) (citations omitted).

8

As for damages, the third cause of action demands "'expectation damages' or lost profits." (Third Amended Complaint ¶ 99).

On April 14, 2008, Defendant answered the Third Amended Complaint. Magistrate Judge Feldman subsequently issued amended scheduling orders [#62, 63], directing that all discovery relating to expert witnesses be completed by November 24, 2008, and directing that dispositive motions be filed by January 22, 2009. On or about July 28, 2008, Plaintiff provided Defendant with a damages report by Plaintiff's Expert, David Smith ("Smith"). Smith's report included a calculation that Plaintiff had incurred damages of "about $2.0 million"[7] as a result of Defendant's failure to provide thirty-thousand spools per week at the Mebane Plant. On or about August 27, 2008, during settlement discussions, Defendant's counsel complained to Plaintiff's counsel that the aforementioned portion of Smith's report should be stricken, since Plaintiff had not pleaded a claim for damages at the Mebane Plant. On October 30, 2008, Defendant deposed Smith, at which time Defendant's counsel re-iterated that Plaintiff had not pleaded a claim relating to a failure to provide thirty-thousand spools per week at the Mebane Plant.

On November 11, 2008, Plaintiff filed the subject motion [#64] for leave to file a Fourth Amended Complaint, seeking to expressly add such a claim. In that regard, the proposed Fourth Amended Complaint is essentially identical to the prior pleading, except for changes to paragraphs 41 and 42, which are part of the first cause of action for breach of contract, and the "wherefore clause" for that claim. Specifically, the proposed amendments allege that

---

[7]Smith subsequently revised that figure downward.

under the contract, Defendant was required to provide more than "10,000 [sic][8] spools per week" for refurbishment at the Mebane Plant, and that the agreement required that Defendant "supplement [Plaintiff's] costs should volumes at the European plants drop below certain levels for a period of three months or more, *while maintaining volumes of 10,000* [sic] *spools per week or greater at the Mebane, North Carolina plant*." (Proposed Fourth Amended Complaint ¶ ¶ 41-42) (emphasis added). Additionally, the proposed amended "wherefore clause," in addition to seeking "$1,727,556.62 . . . related to the closure of European operations," demands "lost profits for failure to provide 10,000 spools per week at the Mebane, North Carolina facility during European operations." *Id*. at ¶ 56.

In support of the application to amend, Plaintiff maintains that such an application is not really necessary, since the Third Amended Complaint already contains a claim for damages relative to the thirty-thousand-spool-per-week requirement:

> For its part, [Plaintiff] believes that, pursuant to Federal "notice pleading" standards, the 30,000 spool issue had indeed properly been pleaded . . . . Plaintiff . . . does not believe that an amendment to the Third Amendment [sic] Complaint is required in order to properly place the issue of damages resulting from Corning's failure to supply 30,000 spools per week at Mebane before the jury. Again, in an abundance of caution, and in order to avoid the disruption of a motion *in limine* or oral objections at time of trial, [Plaintiff] submits this motion now. . . . The requested amendment will require absolutely no additional work on the part of Corning, proposes no new causes of action, no new theories, and no facts that have not been discussed by the witnesses and experts of both parties at the various depositions that have taken place.

(Pazan Affirmation [#68], ¶ ¶ 17-22). Defendant opposes the motion to amend, on three grounds: 1) Plaintiff has not shown good cause for the amendment; 2) Defendant would be

---

[8]Plaintiff's counsel stated during oral argument that the 10,000-spool figure, which appears repeatedly throughout the proposed pleading, is a typographical error, inasmuch as the contract actually states the requirement as being 30,000 spools per week.

prejudiced by the amendment, since it adds an entirely new cause of action on the eve of the deadline for filing dispositive motions; and 3) the amendment would be futile, since the agreement does not provide for damages relative to the thirty-thousand-spool-per-week provision.

On March 20, 2009, Plaintiff filed its subject motion for partial summary judgment [#82], seeking, as to Plaintiff's first cause of action for breach of contract, a declaratory judgment regarding the meaning of the contract's "Base Loading" provision, set forth above. Specifically, Plaintiff seeks a declaration that the provision entitles Plaintiff to: 1) operating costs for its plants in Wales and Germany during any three-month period in which Defendant did not provide at least 35-40 pallets of spools; 2) costs related to the closing of the plants; and 3) lost profits at the Mebane Plant resulting from Defendant's failure to provide at least thirty-thousand spools per week. According to Plaintiff, as a matter of law, the "Base Loading" provision

> can only be interpreted to mean that once European facilities were opened and [Plaintiff] was extended, if volumes dropped below 35-40 pallets per week for a three month period, [Defendant] would supplement all the costs (defined as actual losses) sustained by [Plaintiff] in Europe, with the supplement calculated up to a ceiling of the minimum required 35-40 pallet volume levels, *while continuing to supply the 30,000 spools per week in Mebane*.

(Plaintiff's Memo of Law [#84] at 10) (emphasis in original; footnote omitted). Alternatively, Plaintiff maintains that even if the provision is ambiguous, that the extrinsic evidence requires judgment in Plaintiff's favor as to the meaning of the provision. *Id*. at 18 ("[Plaintiff's] interpretation . . . is supported by all the extrinsic available evidence surrounding the negotiation of the contract.").

11

On March 20, 2009, Defendant filed its subject cross-motion for partial summary judgment [#86], seeking a determination that Plaintiff: 1) cannot recover lost profits on its promissory estoppel claims; and 2) cannot recover pre-judgment interest in excess of 9% as to any of its claims. As to the promissory estoppel claims, Defendant maintains that Plaintiff's demand for lost profits is based on the theory that, since Defendant allegedly misled Plaintiff into believing that the parties would negotiate a new contract, Plaintiff is entitled to the profits that it would have earned under such a contract. Defendant contends that no such damages can be awarded, since the terms of such a hypothetical agreement are speculative. (Defendant's Memo of Law [#86-3] at 1) ("[Plaintiff] now claims in Counts II and III that it should be awarded the profits it would have earned had [the parties] continued to do business, a new three-year contract been entered into, and had [Defendant] allowed [Plaintiff] to use [plaintiff's] new production method. That is the epitome of speculation and . . . New York prohibits an award of lost profits in such situations."). Plaintiff counters that "lost profit" damages would not be speculative, since "the parties were married to each other by virtue of the 'prepaid balance,' and therefore knew exactly what their future would look like, new contract or not." (Plaintiff's Memo of Law [#92] at 1).[9] Plaintiff further states that lost profits would not be speculative since a "draft contract was actually produced" years earlier. *Id*.

The second aspect of Defendant's partial summary judgment motion is directed at Plaintiff's demand for pre-judgment interest at a rate of 13%. Defendant contends that New York Civil Practice Law and Rules ("CPLR") § 5004 establishes a pre-judgment interest rate

---

[9]This statement calls to mind a comment by Plaintiff's counsel, made during oral argument on an earlier motion in this case, that Plaintiff is entitled to "corporate alimony" from Defendant.

12

of 9% on contract actions, and that Plaintiff therefore cannot recover more than 9% pre-judgment interest on its first cause of action for breach of contract. Similarly, Defendant contends that to the extent that Plaintiff may succeed in obtaining contract damages on its promissory estoppel claims, that such damages would also be limited to 9% by CPLR § 5004. Defendant admits, though, that courts have discretion to set pre-judgment interest on claims of an equitable nature. In response, Plaintiff contends that "the equitable nature of its claims justifies a rate similar to that [Defendant] charged to [Plaintiff], which is 13%." (Plaintiff's Memo of Law [#92] at 2).

DISCUSSION

*Plaintiff's Motion to File A Fourth Amended Complaint*

Plaintiff seeks to amend its complaint even though the court-imposed deadline for making such applications expired in 2007. The legal principles applicable to such a motion are clear:

> Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, a court should freely give leave to amend when justice so requires. . . . Generally, a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party. Where, as here, a scheduling order governs amendments to the complaint, see Fed.R.Civ.P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."), the lenient standard under Rule 15(a), which provides leave to amend shall be freely given, must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause. Whether good cause exists turns on the diligence of the moving party.

*Holmes v. Grubman*, — F.3d —, 2009 WL 1531964 at *4 (2d Cir. Jun. 3, 2009) (citations and internal quotation marks omitted).

13

Here, the Court finds that Plaintiff has not shown good cause for the late application. In that regard, Plaintiff initially did not attempt to show good cause, and instead, argued that the proposed amendments were not substantive. The Court, though, disagrees and finds that the proposed amendments raise an entirely new theory of recovery. Alternatively, Plaintiff indicates that it did not assert the claim sooner, because it could not quantify the damages until it received its expert's report. (*See*, Plaintiff's Memo of Law [#65] at 3) ("It was arguably not until the loss expert David Smith completed his report on July 28, 2008 that [Plaintiff] had a number to attach to the loss associated with the failure to provide 30,000 spools per week at Mebane."). However, as Plaintiff has argued throughout this case, the federal rules provide for notice pleading, and Plaintiff could have asserted the proposed amended claim without regard to a specific damage estimate. In any event, the proposed Fourth Amended Complaint does not assert a specific dollar amount for this new claim, but instead, demands only "lost profits for failure to provide 10,000 [sic] spools per week at the Mebane, North Carolina facility during European operations." (Proposed Fourth Amended Complaint ¶ 56). Accordingly, the Court finds that Plaintiff's explanation for failing to assert the claim sooner does not amount to good cause, and that Plaintiff was not diligent in asserting the proposed claim. The Court also finds that the proposed amendment would prejudice Defendant, since the Court would need to reopen discovery, which would further delay the resolution of the case. Having performed the balancing described above, the Court denies the motion to amend. Since the Court finds that the motion must be denied for the reasons already stated, the Court does not reach Defendant's alternative argument regarding futility of the amendment.

*Plaintiff's Motion for Partial Summary Judgment*

Plaintiff seeks partial summary judgment on the first cause of action, concerning the meaning of the Base Loading Provision. Specifically, Plaintiff asks the Court to declare, as a matter of law, that the Base Loading provision "means that [Defendant] is responsible for supplementing the operating losses arising from the shortfalls in stated minimum volume levels in Europe . . . [and] for lost profits in the US, and also requires [Defendant] to supplement [Plaintiff's] shut down costs in Europe." (Plaintiff's Memo of Law [#84] at 1).

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

15

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).

At the outset, based on the Court's earlier discussion, Plaintiff has no claim for lost profits at the Mebane Plant in this action. Accordingly, Plaintiff's motion is moot to the extent that it seeks a declaration as to rights to "lost profits in the US."[10] As for the remainder of Plaintiff's motion, the Base Loading provision does not specifically refer to "shut down costs," and the parties disagree as to whether they intended to provide for such costs. Similarly, the

---

[10] If the claim were not moot, Plaintiff would still not be entitled to summary judgment, since the Base Loading Provision makes no mention of "lost profits," and the parties disagree as to whether the provision was intended to provide for any payment to Plaintiff relative to the thirty-thousand-spool-per-week term.

16

parties disagree as to meaning of the term "supplement." Accordingly, the Court finds that there are triable issues of fact concerning the meaning of the Base Loading Provision. Plaintiff's application for partial summary judgment is therefore denied.

*Defendant's Motion for Partial Summary Judgment*

Defendant seeks partial summary judgment on Plaintiff's promissory estoppel claims in the second and third causes of action. Specifically, Defendant seeks a declaration that Plaintiff cannot recover profits that Plaintiff believes it would have earned if the parties had negotiated a new contract, including an agreement to use re-foamed spools, and had continued to do business after repayment of the prepaid balance, since such damages would be speculative.[11] In response, Plaintiff maintains that its demand for "lost profits" is "not speculative at all." (Plaintiff's Memo of Law [#92] at 1). The Court agrees with Defendant, and finds that Plaintiff cannot recover "lost profits" that it might have earned if the parties had actually negotiated a new agreement following the repayment of the prepaid advance. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 74 n. 2 (2d Cir. 1989) ("Here, [defendant's] alleged failure to bargain in good faith is not a but-for cause of [plaintiff's] lost profits, since even with the best faith on both sides the deal might not have been closed."); *Goodstein Const. Corp. v. City of New York*, 80 N.Y.2d 366, 373, 590 N.Y.S.2d 425 (1992) ("[A] party's alleged failure to bargain in good faith is not a but-for cause of plaintiff's lost profits, since even with the best faith on both sides the deal might not have been closed and attributing plaintiff's lost profits to defendant's bad faith may be speculative at best.") (citation

---

[11]Alternatively, Defendant contends that, since the agreement that Plaintiff sought but did not obtain, following repayment of the advance, was to be a multi-year deal, it would be barred by the statute of frauds. In response, Plaintiff discusses the Prepaid Advance Agreement, but does not address Defendant's argument. (Plaintiff's Memo of Law [#92] at 1-2, 8-10).

17

and internal quotation marks omitted). In that regard, it is clear that there was never a meeting of the minds regarding a new agreement, including any agreement regarding new re-foaming methods. Consequently, Plaintiff cannot recover "lost profits" on its promissory estoppel claims.

Defendant also seeks a declaration that Plaintiff cannot recover pre-judgment interest in excess of 9% on any of its claims. On this point, Defendant argues that Plaintiff is essentially seeking contractual expectation damages on all of its claims, including the promissory estoppel claims. (Defendant's Memo of Law [#86-3] at 22-23). Plaintiff responds that courts have discretion to set pre-judgment interest in equitable cases. (Plaintiff's Memo of Law [#92] at 20).

It is clear that in New York, the rate of pre-judgment interest is nine percent per annum, CPLR § 5004, "except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." CPLR § 5001(a). Here, there does not appear to be any dispute that the pre-judgment interest rate on Plaintiff's claims for breach of contract would be nine percent. The dispute is with regard to Plaintiff's promissory estoppel claims, and as to those, Defendant argues that, although the claims are "equitable in nature, they seek damages that are legal in nature, lost profits." (Defendant's Reply Memo [#109] at 10). However, as discussed above, Plaintiff cannot recover contractual lost-profit expectation damages on its promissory estoppel claims. Therefore, any damages that Plaintiff may recover on its promissory estoppel claims would be equitable in nature, and the Court would have discretion to set the pre-judgment interest rate.

CONCLUSION

Plaintiff's applications [#64] [#82] are denied in their entirety. Defendant's application [#86] is granted in part and denied in part as follows: The application is granted insofar as Defendant seeks a declaration that Plaintiff cannot recover contractual "lost profit" damages based on Defendant's alleged failure to negotiate a new agreement, and insofar as Defendant seeks a declaration that the pre-judgment rate of interest on Plaintiff's contract claims would be nine percent; the application is denied insofar as Defendant seeks a declaration that pre-judgment interest on Plaintiff's equitable promissory estoppel claims would similarly be capped at nine percent.

SO ORDERED.

Dated: July 21, 2009
Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge